Filed 9/23/25  P. v. McDaniel CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>          v.<br><br>KENDALL LESHEED MCDANIEL,<br><br>     Defendant and Appellant. | F086930<br><br>(Super. Ct. No. BF192564A)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  Michael G. Bush, Judge.

Sandra Gillies, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Dina Petrushenko and Carly Orozco, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

**INTRODUCTION**

Defendant Kendall Lesheed McDaniel communicated with an undercover detective who posed as a 16-year-old commercial sex worker, and a jury convicted him of trafficking a minor. The trial court found true that defendant had a prior strike conviction and sentenced him to prison for a term of 24 years.

Defendant appeals, arguing (1) the evidence is not sufficient to support the verdict, (2) the trial court abused its discretion in permitting an expert to testify that some rappers had worked as pimps, (3) the prosecutor committed misconduct by presenting video clips of rapper interviews that had not been admitted into evidence during closing argument, (4) the trial court failed to instruct the jury as to the dual nature of a detective's role as both an expert and percipient witness, (5) the trial court erred in failing to instruct the jury as to lesser included offenses of contributing to the delinquency of a minor and attempted inveiglement of a minor, and (6) the trial court abused its discretion by allowing evidence of communications with other sex workers as evidence pursuant to Evidence Code sections 1101 and 352.

We reject defendant's claims and affirm the judgment.

**PROCEDURAL BACKGROUND**

The District Attorney of Kern County filed an amended information on August 16, 2023, charging defendant with inducing and attempting to induce an individual he believed to be a minor to engage in a commercial sex act with intent to commit pandering or pimping (Pen. Code, § 236.1, subd. (c);[1] count 1). The amended information also alleged that defendant had been convicted of a prior strike conviction within the meaning of the Three Strikes law (§§ 667, subds. (b)–(i), 1170.12) and various aggravating sentencing factors, including: the victim was particularly vulnerable (Cal. Rules of

---

[1]     Undesignated statutory references are to the Penal Code.

2.

Court, rule 4.421(a)(3));[2] the crime was committed with planning and sophistication (rule 4.421(a)(8)); defendant had numerous prior convictions or sustained petitions in juvenile delinquency proceedings of increasing seriousness (rule 4.421(b)(2)); he served a prior prison sentence (rule 4.421(b)(3)); he was on probation or parole when the crime was committed (rule 4.421(b)(4)); and his prior performance on probation or parole was unsatisfactory (rule 4.421(b)(5)).  Defendant pleaded not guilty and denied the allegations.

On August 21, 2023, a jury convicted defendant of human trafficking of a minor as charged in count 1.  Defendant waived his right to a jury trial as to the sentencing enhancements, and the court found true the prior strike conviction allegation and all but two of the aggravating sentencing factor allegations.

On September 26, 2023, the trial court denied defendant's motion to strike his prior strike conviction, sentenced him to 24 years in prison, and further ordered that he register as a sexual offender (§ 290) and pay $300 restitution and suspended parole revocation restitution fines (§§ 1202.4, subd. (b), 1202.45), a $1,230 sexual habitual offender fine and related penalty assessments (Pen. Code, §§ 290.3, 1464, subd. (a), 1465.7; Gov. Code, §§ 70372, subd. (a), 76000, subd. (a), 76000.5, 76104.6, 76104.7), a $40 court operations assessment (§ 1465.8), and a $30 criminal conviction assessment (Gov. Code, § 70373).

Defendant filed a timely notice of appeal on September 28, 2023.

**FACTS**

Detective Kameron Bailey of the Bakersfield Police Department's Human Trafficking Task Force surveilled an area of Bakersfield where prostitution occurred, known as the "Blade," for approximately one and a half years prior to defendant's arrest.  He saw defendant there weekly.  Sex workers congregate in the Blade approximately one

---

**2**      Undesignated rule references are to the California Rules of Court.

block from a gas station where the sex traffickers congregate to check on the workers and collect money. Bailey usually saw defendant at the gas station at different times of the day and night and for several hours.

As part of his duties, Bailey managed undercover social media accounts, including an Instagram account for a fictitious 16-year-old named Jasmine (Jazzymine_99). The account displayed posts from "motivationtothegame," an account that posted about sexual exploitation. Sexual exploitation and human trafficking are referred to as "the game," and include the victims committing sex acts for money and the suspects who profit from the sex acts.

On December 6, 2022, Bailey identified defendant's Instagram account as "Moneymakinpookie23" based upon its use of the name "pookie" (defendant's moniker), its profile picture was defendant's photograph, and it had "selfie" photographs of defendant and vehicles that Bailey had observed defendant driving.

### Communications with Bailey undercover

On December 6, 2022, Bailey used his undercover account of "Jazzymine_99" to "like" defendant's repost of a message from "motivationtothegame" concerning sexual exploitation. Defendant responded, "You ready?" Bailey told defendant that he was ready and intended to return to Bakersfield in a few days. Defendant asked, "Yeah, so who you folks?" (a term referring to a sex worker's current exploiter). Bailey replied that he did not have folks but wanted to work with folks familiar with Bakersfield and would purchase a new phone after earning some money. Defendant told Bailey to "tap in" when he was back.

Bailey asked, "What's your fee? I ain't got much right now because those Bs took everything with my phone." He testified that the term "fee" referred to the fee required to be paid to a sexual exploiter when a sex worker commenced working for them. Bailey communicated that he was in Los Angeles and found defendant by looking "at

4.

Bakersfield people's pages," and defendant "look like you about the bag[3] and that's what I want." Defendant replied, "Well, like I said, come 1,000 and then we and then we can talk," and provided his phone number. Bailey promised to "work a few nights" to earn "the band" (a term referring to $1,000) but explained that other individuals had made "it hard for me to make my money the last few days." Defendant agreed that they would "play on 89th," which referred to a street located within "the Blade" in Los Angeles and known for commercial sex work.

Bailey replied that he wanted to be in Bakersfield. Defendant told him to take the bus. Bailey asked if defendant would let him "come in before the band," and that he had $300 but could make more money fast with the right folks. Defendant responded, "get your ticket and bring your ass." Bailey responded that it might be a few days, and defendant replied, "Fuck all your shit. It's time to start new." Bailey responded that he was nervous and knew that defendant was "about it" but "never met dads on the grand before knowing him." Defendant said to use his phone number, but Bailey claimed he could only use the "wifi" portion of the phone. Defendant advised that the first step was to obtain a phone, and Bailey promised to do so.

Bailey asked "[w]hat game" they would play in Bakersfield because he knew that it was slower and wanted to join him "for real." Defendant replied, "Look, ma, I don't know what you got going on, but I'm really with this shit and not in this to play and conversate [phonetic], ma. Either you ready to choose or you ain't. Like I said, get a phone right now and then hit me. We can go from there." Bailey responded, "Yeah, I've been ready to choose and come to Bakersfield and stay there. I just trying to make sure I choosing right. That's all. I appreciate you, though, for real." Defendant replied, "I got to know you serious about this shit. Like, you came out of the blue with this. So, yeah, handle that asap, ma, and we can go from there." Bailey advised that he was serious and

---

**3**        Bailey testified that the term "bag" references money.

did not "play" with "the bag" (money) ever, that he was going to Bakersfield because it was his home and he needed "good folks to elevate with me," assuring defendant that he wanted to be safe and could tell defendant was serious. Defendant responded that Bailey would be safe with him, and he would know that Bailey was serious when Bailey took the steps necessary, like obtaining a phone. Defendant stated, "Don't talk about it. Be about it, ma." Bailey replied that he would save up and go to Bakersfield. Defendant told Bailey that if he did not have a phone, he should "get here, and the rest is [defendant's] problem." Bailey replied that he would be there by the weekend or sooner. Defendant stated that he needed "to know fo sho," then Bailey agreed to let defendant know, and defendant asked to be updated.

Defendant communicated with Bailey again the following day to check in, and Bailey advised that he was relaxing. When Bailey indicated that he was not motivated, defendant responded that he should not let anyone "get into the bag" (referring to money) and ignore them and work harder. Bailey thanked defendant and said he needed encouragement on a daily basis and would be "top tier" with the right mindset. Defendant told Bailey to "[g]et money" and "that's why I'm here, to remind you." He wrote, "I'm the N to make sure the rent paid, hair and nails done, take trip and make sure you elevate in this game." Bailey liked the message and responded, "Damn, you need to write a book. Not gonna lie, that shit got me feeling all kind of ways."

Bailey continued, "I want to make dads rich and live that high life with you in this game." Defendant stated that he would have picked Bailey up but had never seen him. Bailey promised to tell defendant everything about him once he arrived in Bakersfield and obtained a working phone. Defendant said he would be patient, and Bailey advised that "hella Ps be hitting me up right now because I ain't got my folks no more, but I like the way you speaking to me." The terms "P" and "folks" refer to sexual exploiters, and Bailey was communicating that he currently did not have a sexual exploiter, and other sexual exploiters were attempting to recruit him. Defendant replied, "Well, tell them Ns

6.

new P in town. Pimpin Pookie, baby," referring to himself as a sexual exploiter and "Pimpin Pookie."

Defendant stated that he would be able to fulfill the dream he promised, and Bailey replied that he would tell the other sexual exploiters that he "already got my new dads" and was interested in hearing defendant's vision. Defendant responded that he was waiting, and Bailey stated that defendant would not have to wait long. Defendant stated, "I play Fig," a reference to sexual exploiting on a particular street in Los Angeles, and offered to reach out to the individuals with whom Bailey had problems, but Bailey indicated he just wanted to move on. Defendant asked if Bailey was "trappin tonight" (meaning earning money through commercial sex work), and Bailey responded that he would be and wanted to "stack it up for you." Defendant stated he would be waiting and for Bailey to keep him updated.

Four hours later, defendant messaged and asked, "What are you doing, ma? Are you good?" Bailey responded, "Hella traffic all night, dads," and "I'm stacking fat now." Defendant asked, "Is you ready to come home? I got a tank full of gas ready to come get that ass." Bailey replied that he would continue working that evening and then, "I'm coming tomorrow with the pocket stacked for us." Bailey asked, "You can come get me from the bus station, yeah?" and indicated that he intended to travel with someone else.

The following day, on December 8, 2022, defendant initiated communication with Bailey. Bailey mentioned defendant's white car, and defendant told Bailey he would be able to ride in it. Defendant said, "If you trap right, I'll get you a spot and a whip, ma," meaning that if Bailey performed well as a commercial sex worker, defendant would provide him a residence and a vehicle. Bailey promised to "trap the way you say," and defendant stated that he "love to see a B elevate so I can elevate." Bailey replied that he was motivated, and defendant responded, "I love it. That's why I'm in it to win it."

Bailey stated that he had a friend that he was attempting to recruit "to trap with us" because she did not have "folks" and wanted to "renegade." Defendant replied that he

7.

wanted to work on Bailey, and if the friend "like what she see, tell her to join the team." Defendant asked why the friend did not have folks, and Bailey replied that she wanted a better situation and Bailey had told her about defendant. Defendant asked for the friend's "gram" (referring to Instagram), but Bailey stated that the friend had a "snap" (Snapchat account), but he did not know the account name. Defendant asked Bailey why he did not post photographs on his account. Bailey then revealed to defendant that he would turn 17 years old in March, but swore that he looked older, and his friend was 30 years old. Bailey testified that while he began communicating with defendant on December 6, 2022, he told defendant that he was 16 years old on December 8, 2022. Bailey testified that minor sex workers earn more money than adults, but the sexual exploiter risks heavier penalties for trafficking a minor.

Bailey explained that he lied because he did not know defendant yet and was "playing it safe." Defendant replied, "Loyalty and respect and no lying is all I ask for." Bailey promised not to lie about anything else going forward. Bailey stated that he wanted to come the following day and, "[W]e can trap there right when I get there." Defendant told Bailey to "hit" him when he arrived and was ready. Bailey replied that he was ready and his friend was "on the team." Defendant stated that he needed to know if law enforcement was involved. Bailey responded, "The fuck no, dads. But if it make it better, I can just split from her. I don't want you to ever have to question my loyalty." Defendant stated that it was alright.

Bailey asked if defendant cared what time he arrived on the bus, and defendant replied, "As long as you get here, ma." Bailey stated that he was looking at bus tickets and wanted to ride "the white whip" (referring to defendant's car). Defendant replied that his car was in the shop. Defendant advised Bailey to take the later bus, and Bailey posted a copy of the bus ticket showing his arrival at 12:50 p.m. Bailey told defendant he and his friend would "hit the Blade" and "stack up one more night" before arriving the

8.

following day. Defendant replied, "Hoe safe." Bailey stated that he was nervous, and defendant told him to "bring that ass" and get on the bus.

The next day, on December 9, 2022, Bailey messaged defendant and told him that he was about to get on the bus and would arrive at 12:50 p.m. Defendant said that he would be at the bus station, and Bailey told defendant that Bailey would be wearing black. Defendant wished Bailey a safe trip.

### Defendant's conversation with Tyrone Scott

Prior to his arrest on December 9, 2022, defendant spoke with Tyrone Scott, another sexual exploiter who was in custody and charged with human trafficking. During the conversation, Scott asked defendant, "Did you . . . land a situation?" Defendant replied, "They on their way," and added, "They hit me this morning talking about they was on the Greyhound." Scott told defendant, "I'm proud of you," and defendant replied, "She said she bringing a friend." Bailey explained that the call was significant because he had communicated to defendant that Bailey would be arriving by Greyhound bus to Bakersfield with a friend, and defendant agreed to pick Bailey up.

### Defendant's arrest

Defendant told Bailey that defendant would pick Bailey up from the bus station at 12:50 p.m., and defendant arrived at the bus station at 12:47 p.m. Officers saw defendant arrive in a vehicle with another individual, arrested defendant as he stood outside the vehicle, and seized defendant's cell phone. Bailey confirmed the phone number was the number defendant had provided when communicating with him. Bailey's Instagram communications with defendant were found on defendant's phone.[4]

---

[4] Other information found on the cell phone connected the phone to defendant, such as an e-mail address in defendant's name, an apple identification containing defendant's moniker "pookie," selfie photographs of defendant, and messages in which the sender or others referred to defendant as "Pookie" or Kendall.

*Communications with other sex workers*[5]

**Communications with T.J.**

T.J. is an adult victim of sexual exploitation and human trafficking and was cooperating against her pimp, Damon Phillips, to ensure his arrest and that she would no longer be exploited. Bailey interviewed her several times, and she provided him with screenshots of her communications with defendant that she previously sent to Phillips. The messages concerned defendant's attempts to convince T.J. to work for him rather than Phillips.

T.J. texted defendant that she had observed him driving in his Mercedes Benz. Defendant stated, "You be working, We could have been gettin it, ma. I take trips. . . . I just got back from Vegas. But to keep it real, Bakersfield is a steady track. A mother fucker should never leave this Blade without 500. But, yeah, whenever you're ready to come to Pookie, you know what's up. . . . I'm trying to see if you gonna F with your boy or what." Bailey explained that the statements indicated that defendant was trying to recruit T.J. to work for him by describing that he was a successful sexual exploiter, and T.J. would be successful if she worked with him on the Blade. Defendant also texted, "Yes, and who you be F-ing with? You better say nobody but me now." In this context, defendant used the the term "f-ing with" to inquire if T.J. was working with another sexual exploiter. When defendant texted he was trying to see if T.J. was "gonna F with your boy"—he was asking if T.J. intended to continue working with her sexual exploiter and telling her that she should only work with him.

In another text thread, defendant asked, "[Y]o ass be getting it, huh?" T.J. replied that she could not be broke and needed money. Defendant asked what she was doing

---

[5]    Defense counsel elicited from Bailey that he did not know if the other women communicating with defendant were minors.

with it, and T.J. responded that she was saving it. Defendant asked to meet with her to discuss working with him.

**Communications with Cherry**

Bailey reviewed messages on defendant's phone with Cherry. Cherry called defendant "Daddy" numerous times, which is a term commonly used by a sexual exploitation victim to refer to her exploiter. Cherry advised defendant that she "posted," which means that she posted commercial sex acts on advertising websites on the Internet. Cherry used a digital application named "Cash App"[6] to transfer money to defendant with the description "out-call deposit." When a sex worker posts an advertisement to perform commercial sex acts, the sex date will be an "out-call date" (meaning the sex worker will go to the customer), an "in-call date" (the customer goes to the sex worker's location), or a "car date" (the meeting will occur in a car). Thus, Cherry received and then provided defendant with $25 she received as a deposit for an out-call sex act and, 20 minutes later, provided an additional $250. Bailey received records from defendant's Cash App account, which showed that he received several transactions from Cherry between November 17 and December 6, 2022, totaling approximately $2,113.

Bailey found an audio message on defendant's phone from Cherry that advised her mother was angry that she had been on the Blade hoeing for years and offered to pay Cherry the same money that she made from selling her body if Cherry stopped selling her body.

**Communications with an unidentified sex worker**

Defendant's Instagram account also included conversations with other individuals. One individual communicated that she was "[o]n my same program, out the way, getting to it," meaning that she did not work for a sexual exploiter but was earning money for

---

[6]     Cash App is the most used application for payment between commercial sex workers, sexual exploiters, and buyers.

herself. When defendant messaged her later, the individual advised that she was "[j]ust getting started. It's been cracking since the 1st, though." Defendant asked when she would "stop playin," and join his team. The individual responded, "I'm not playing, but, seriously, what I need you for?" Defendant responded that he was a good investment in an attempt to lure her to work for him. The individual asked defendant how he could help her. Defendant responded, "Shit, loyalty and good management, ma." The individual responded that she was loyal to herself, managing herself "pretty good," and stacking more than she was spending. The individual explained that she had been "trapping" (making money from commercial sex work) for six months and figured "the game" out without the need for a sexual exploiter. Defendant then confirmed that she did not want a sexual exploiter by responding, "Well, seems like you so-called got it figured out, huh? You like F some Ism, huh," using the term "Ism" to refer to "pimpism" or the game of a sexual exploiter.

### Evidence from defendant's cellular phone

Bailey testified that the Internet history on defendant's phone showed that he accessed the website "skipthegames.com," a website where commercial sex workers post advertisements that list sex acts, prices, and city and state locations, approximately 322 times. Defendant possessed a login to this website to create and post sex work advertisements. Defendant created one such advertisement on November 22, 2022, when he took a screenshot while accessing the site. Using the Internet to advertise commercial sex acts is called "playing the Internet," while "playing on the ground" refers to walking the Blade and trying to obtain sex dates from individuals driving past. Bailey found evidence that defendant had created and posted a commercial sex worker advertisement on defendant's phone, including screenshots of the phone during the process, an advertisement for a female escort showing prices and abbreviations for sex acts, and a resulting account verification.

Defendant visited "Megapersonals.eu" 62 times and also visited "adultlook.com," "adultsearch.com," and "2backpage.com." Bailey found evidence that defendant had conducted Internet searches for "Jasmine from Barstow" and for the bus station in Bakersfield where defendant had agreed to meet Bailey.

Location information for defendant's phone showed that he had frequented Las Vegas and the Blade. Defendant's phone showed receipt of a $400 payment from someone using the name Cassandra Scott, and records obtained from the company associated with Cash App showed that Cassandra Scott's Cash App account sent defendant's account approximately $1,629 between September 20 and November 16, 2022.[7]

***Other content from defendant's Instagram account***

Other content from defendant's Instagram account was admitted into evidence, and Bailey reviewed it with the jury. Defendant's account was followed by the "motivationtothegame" social media account, which posted content related to commercial sex work and human trafficking.

The biography information for defendant's Instagram account read, "If it's not about money I don't want to hear it," followed by three money bag emojis, "My," three feet emojis, "wanna see me shine," emojis showing the letters AOB, and three hands reaching out emojis. Bailey explained that sexual exploiters flaunt the amount of money made by sexual exploitation to appeal to potential sex workers. He explained that the term "feet" refers to their victims (sex workers) because they use their feet to walk the Blade, "AOB" stands for "all on a bitch" and refers to sexual exploiters relying on the females to make money, and the hand reaching out emoji indicates a sexual exploiter waiting to collect money. Defendant's account also included a photograph of the gas

---

[7] On November 16, 2022, defendant posted a photograph of a Cash App payment on his Instagram account with the caption, "Woke up to a bag. Daddy loving it." The payment was from the account of Cassandra Scott and in the amount of $400.

13.

station on the Blade where sexual exploiters waited with the caption, "Big pimpin. I stay on the Blade, and, believe me, I don't want no 304 that don't wanna be kept or that ain't trying real step," followed by three hand emojis, three dollar sign emojis, three king emojis, and three speaking emojis. Bailey explained that "304" is slang for a commercial sex worker which, if the numbers are turned upside down on a calculator, spell the word "hoe." The crown emojis represent sexual exploiters who refer to themselves as kings or royalty, and a sex worker might say, "[D]own for the crown," meaning they are willing to work for their exploiter.

Defendant posted, "[Y]ou call me a pimp like its's a bad thing," followed by a photograph of a song playing called "Blade Hot," which references the area in a city common for prostitution. Other posts included: "Bitch, get up off your ass and go get me a bag" (ordering a commercial sex worker to stop being lazy and make money); "It's the chosen one. Me. Pay me or pay no attention. RPGO" (short for "real pimping going on"); a photograph of a white Mercedes car captioned, "I went through the struggle for a long time, and now the pimp god said it's my turn. Pimpin Pookie will not stop";[8] and "All on the feetz P" ("feetz" refers to commercial sex workers and "P" means that women make the money for him).

Referencing additional posts on defendant's account, Bailey explained that a sex worker chooses a sexual exploiter, and the term "choose-up fee" refers to the fee that a sexual exploiter charges the sex worker when they initially commence work, usually between $1,000 and $10,000. Defendant's account had posts bragging that he could make money and teach the sex workers how to manage and invest their own money to lure individuals to work for him. Another post showed a male with the letter "P" on his hat, instructing three women wearing crowns promising to be honest, loyal, and

---

[8]     Bailey testified that he observed defendant driving this white Mercedes and defendant was once stopped while driving this vehicle.

14.

respectful by responding, "Yes, Daddy," a term used to refer to the sexual exploiter. Defendant also posted, on December 7, 2022, that he did not choose to be a sexual exploiter, but the life chose him.

A sexual exploiter uses motivation to lure a sex worker to work with him by selling a dream that he can provide a better life, large amounts of money, and other perks, encouraging the sex worker to "think big" and imagine the better life that results from earning money by sex work. Defendant also posted a story that describes some rules of "the game," encouraging the sex worker to stay "in pocket" (follow the rules of the games) and not be a "renegade" (perform sex work without paying a sexual exploiter).

In another post, an individual asked defendant how things are going, and defendant responds, "Shit, tryin make it now. Shit, my hoe bitch chose up. So I'm looking for another one," meaning that a sex worker previously working for defendant had left to work for another sexual exploiter. In another post, defendant indicated that he had been in Las Vegas and explained, "That's the only time I'm hitting the road is when I'm taking these hoes to get that bag." In another post, defendant discussed with another sexual exploiter a sex worker who had left and wanted to return, indicating that she would have to work harder as punishment for leaving. He also posted that he was "trappin" (meaning that he was earning money from a sex worker). When asked if he was working, defendant responded that he was "on the Blade right now." Defendant also posted that he "woke up to a bag" (referring to money) and "Daddy loving it." Other posts showed individuals excited at receiving a payment when a sex worker commenced working for him, other payments from Cash App (an application used by sexual exploiters and sex workers), a message that advised not working with a sex worker until she has paid a fee in advance, and other comments relating to sexual exploitation.

## DISCUSSION

### I. *The evidence is sufficient to support defendant's conviction for human trafficking of a minor.*

#### A. Standard of Review and Applicable Law

In reviewing the sufficiency of evidence to support a conviction, we examine the entire record and draw all reasonable inferences therefrom in favor of the judgment to determine whether it discloses substantial credible evidence from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Brooks* (2017) 3 Cal.5th 1, 57.) Resolving conflicts and inconsistencies in the testimony is the jury's "exclusive province." (*People v. Young* (2005) 34 Cal.4th 1149, 1181.) We do not redetermine the weight of the evidence or the credibility of witnesses. (*People v. Albillar* (2010) 51 Cal.4th 47, 60; see *Young*, at p. 1181].) "Moreover, unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction." (*Young*, at p. 1181.)

We must accept logical inferences that the trier of fact might have drawn from the evidence even if we would have concluded otherwise. (*People v. Streeter* (2012) 54 Cal.4th 205, 241, overruled on other grounds as stated in *People v. Harris* (2013) 57 Cal.4th 804, 834.) "If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding." (*People v. Albillar, supra*, 51 Cal.4th at p. 60.) If more than one inference may reasonably be drawn from the evidence, we accept the inference supporting the judgment. (*People v. Manibusan* (2013) 58 Cal.4th 40, 87.) " 'The same standard of review applies to cases in which the prosecution relies primarily on circumstantial evidence . . . .' " (*People v. Houston* (2012) 54 Cal.4th 1186, 1215.)

The reviewing court need not address "assertions of conflicts in the evidence" or "alternative theories regarding the inferences that should have been drawn from the

16.

evidence." (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 162.) "A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357; accord, *People v. Manibusan, supra*, 58 Cal.4th at p. 87.)

"[S]ection 236.1[, subdivision ](c) operates as follows: To be convicted of the completed crime of inducing a minor to engage in a commercial sex act, the person induced must be a minor. To commit the crime of *attempting to induce* a minor, the defendant must act with the ' "specific intent to commit the [completed] crime" ' [citation], i.e., the intent to cause, induce, or persuade *a minor* to engage in a commercial sex act, at least when no actual minor victim is involved [citation]. The defendant must act with the additional intent to effect or maintain a violation of one of the offenses enumerated in the statute. If these elements are met, the fact that the particular target of his efforts is not actually a minor is not a defense. Under both theories the defendant is guilty of 'human trafficking' (§ 236.1[, subd. ](c)) and subject to the same punishment." (*People v. Moses* (2020) 10 Cal.5th 893, 912–913 (*Moses*), third bracketed insertion in original.) "Liability for an attempt does not require that any element of the underlying offense actually be accomplished." (*Id.* at p. 899.)

The court instructed the jury using CALCRIM No. 1244 that the People had to prove that defendant attempted to cause or induce or persuade another person to engage in a commercial sex act, he intended to commit a felony violation of sections 266h and 266i when he acted, and he believed the other person was under 18 years of age when he did so.

### B.    Analysis

We reject defendant's argument that his conviction for human trafficking was not supported by sufficient evidence. The evidence established that defendant communicated with Bailey, asking if he was ready to perform commercial sex work with defendant,

17.

communicating to Bailey the necessary fee, and encouraging him to commit acts of commercial sex work to raise the money. When Bailey expressed a lack of motivation, defendant provided him encouragement to ignore any individuals who were obstacles and to work harder. Defendant described his role as encouraging Bailey to "[g]et money." Defendant advised Bailey that defendant would be "the N to make sure the rent paid, hair and nails done, take trip and make sure you elevate in this game." Defendant encouraged Bailey to refuse offers of any other sexual exploiters and to "tell them Ns new P in town. Pimpin Pookie, baby," referring to himself as a sexual exploiter and "Pimpin Pookie." In recruiting Bailey to work for him, defendant promised that he could fulfill her dreams and offered to assist with other sex workers giving Bailey problems. Defendant also promised that if Bailey performed well as a commercial sex worker, defendant would provide Bailey with a residence and a vehicle. Even after Bailey advised defendant that he was only 16 years old and promised to perform commercial sex acts for defendant as soon he arrived, defendant instructed Bailey to contact defendant when Bailey was ready. When Bailey expressed being nervous, defendant told him to "bring that ass" and get on the bus. Defendant agreed to meet Bailey at the bus station to provide a ride.

Defendant's conviction was supported by sufficient evidence that he encouraged Bailey to travel to Bakersfield to perform commercial sex acts for him, and that he had attempted to recruit other commercial sex workers with similar promises. Defendant's social media posts and communications with other individuals further demonstrate that defendant earned money from other commercial sex workers, posted commercial sex advertisements, and possessed practical knowledge concerning commercial sexual exploitation. Believing that 16-year-old Jasmine (Bailey) was traveling to Bakersfield so defendant could act as Bailey's pimp, defendant agreed to meet Bailey at the bus station and provide him a ride. Thereafter, at the time designated for Bailey to arrive, defendant was there waiting with a car and driver.

Defendant argues that the evidence fails to demonstrate he "persuaded" or "induced" Bailey to do anything, and it was Bailey who induced and persuaded defendant to become Bailey's pimp. Defendant argues that any encouragement provided by defendant was given only after Bailey had already offered to engage in sex work for defendant. Essentially, defendant argues that because Bailey did not need his inducement or encouragement, he cannot be convicted for a violation of section 236.1, subdivision (c), which punishes one who "causes, induces, or persuades," a minor to engage in commercial sex work. However, defendant ignores additional language in section 236.1, subdivision (c), which also punishes *attempts* to cause, induce, or persuade, a minor to engage in a commercial sex act. The evidence need not show that any element of the underlying offense was accomplished (*Moses, supra*, 10 Cal.5th at pp. 912–913), therefore, it makes no difference whether defendant actually induced or persuaded Bailey to engage in commercial sex work. In fact, given that Bailey was not an actual minor or a commercial sex worker, defendant's criminal acts would never induce or persuade Bailey to become a commercial sex worker.

But, as our Supreme Court has made clear, defendant must only act with *specific intent* to cause, induce, or persuade a minor to engage in a commercial sex act, and the additional *intent* to pimp or pander. (*Moses, supra*, 10 Cal.5th at pp. 912–913.) Defendant's communications with Bailey encouraged Bailey to commit commercial sex acts to raise money for defendant's fee and travel to Bakersfield, and defendant promised a ride to Bailey and then traveled to the bus station to meet Bailey. This evidence is sufficient to support the jury's conclusion that defendant intended to cause Bailey to commit a commercial sex act, intended to derive support or maintenance from Bailey's earnings (pimping) and intended to persuade Bailey to prostitute himself (pandering). (See *People v. Zambia* (2011) 51 Cal.4th 965, 980–981 [intent to influence may be inferred from acts of assistance such offering services as a pimp and promising to provide protection, housing and clothing].)

19.

We conclude sufficient evidence supports the jury's verdict.

## II. *The trial court did not err in admitting expert testimony that some rappers had been pimps.*

### A. Background

During the trial, Bailey testified once as the prosecution's expert on human trafficking and then, the following day, to describe his communications with defendant while posing as a teenage sex worker and as to what he found during a search of defendant's cell phone. Defense counsel cross-examined Bailey during the first segment of his testimony and elicited that the Instagram account "motivationtothegame" (from which defendant reposted content on his own account) glamorized pimp culture and pandering but was not criminal.[9] Bailey agreed that the account had a lot of comments and followers, and he did not know whether the account holder was a real pimp. Defense counsel asked Bailey whether, in his training and experience, music contained references to pimping, pandering, pimp culture, and human trafficking. Bailey specified that rap and hip hop music discussed and glamorized being a pimp. He also testified that sexual exploiters typically glamorized themselves, spoke of themselves as royalty, and showed off their money, cars, and the women working for them to appear successful.

After defense counsel finished cross-examining Bailey, the prosecutor asked Bailey whether he had heard rappers confess to being actual pimps prior to their rap careers. Defense counsel did not object, and Bailey testified that he had "[m]any times." The prosecutor next asked Bailey, again without objection, to provide examples of the rappers Bailey observed admitting to being actual pimps. Bailey identified Ice Cube, Ice-

---

[9] Before trial, although ultimately not called as a witness by defendant, defense counsel proffered expert testimony by the defense investigator that pimping "morphed" and "evolved into popular culture" when rappers (such as Eazy-E) sang about pimps in their music. The expert would have testified that defendant's social media account indicates that he pretended to be a pimp to bolster his reputation, since pimps are known to have a lot of money and individuals from particular neighborhoods will respect them. Pimping is glorified in rap music, and rap music commonly includes topics relating to "hoes" and "pimps."

T, and Eazy-E as rappers who discussed their actual involvement in sexual exploitation prior to making money from rap music.

The prosecutor referred to Bailey's testimony the previous day that defendant's Instagram account had a song titled "Blade Hot" posted that contained references to commercial sex work, prostitution, and sexual exploitation. Defense counsel objected to admission of the video as irrelevant and more prejudicial than probative (Evid. Code, § 352). The court overruled the objection in agreement with the prosecutor's argument that the video was relevant to defendant's argument that pimps are glamorized in rap music. Bailey testified that the references to "the ground" and "the Internet" in the song describe a trafficker who posts advertisements for sex workers on the Internet and walks the Blade, like defendant, who posted Internet advertisements and hung out at the Blade.

When the prosecutor again questioned Bailey regarding having viewed interviews of rappers who admitted to real life pimping, defense counsel objected to the answer as calling for hearsay. The court overruled the objection based upon the prosecutor's argument that experts could rely on hearsay for their opinions. Bailey then testified that Ice-T authored a book in which he included a "pimptionary" of terms used by sex traffickers and admitted to being a pimp during an interview and having idolized another pimp. Snoop Dogg admitted that he was a pimp prior to becoming a rapper, and 50 Cent admitted he was a pimp and involved in other crimes prior to becoming a rapper.

Defense counsel attempted to elicit testimony as to Dr. Dre or other rappers who had not been involving in pimping despite rapping about it, but Bailey did not have any such knowledge. Bailey agreed with defense counsel that the song "Blade Hot" did glamorize pimping.

### B. Standard of Review and Applicable Law

We review a trial court's ruling on the admissibility of evidence, including decisions that turn on the hearsay nature of evidence, for an abuse of discretion. (*People v. Sanchez* (2019) 7 Cal.5th 14, 39; *People v. Waidla* (2000) 22 Cal.4th 690, 725.) Under

this standard, the trial court's decision may only be reversed if it was "so erroneous that it 'falls outside the bounds of reason.' [Citations.] A merely debatable ruling cannot be deemed an abuse of discretion. [Citation.] An abuse of discretion will be 'established by "a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." ' " (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 390.)

Hearsay "is evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated." (Evid. Code, § 1200, subd. (a).) In *People v. Sanchez* (2016) 63 Cal.4th 665, our Supreme Court explained that expert witnesses can testify about their general knowledge, which has been gained from hearsay. (*Id.* at p. 676.) However, expert witnesses cannot testify about case-specific facts learned via hearsay "unless they are independently proven by competent evidence or are covered by a hearsay exception." (*Id.* at p. 686.) Case-specific facts are those relating to the particular events and participants alleged to have been involved in the case being tried. (*Id.* at p. 676.)

"As a general rule, the erroneous admission of hearsay evidence will not result in a reversal unless it is reasonably probable the defendant would have received a more favorable result had the evidence not been admitted." (*People v. Landau* (2016) 246 Cal.App.4th 850, 866.)

C.     **Analysis**

Defendant argues that the trial court erred in overruling his objection to the admission of testimony that some rappers had actually been pimps because the evidence was irrelevant, hearsay, outside Bailey's scope of expertise, and more prejudicial than probative. We agree with the People that defendant objected to the evidence on the sole basis that it was hearsay, but any error in admitting hearsay was harmless as the testimony was essentially duplicative of testimony to which defendant failed to object.

22.

### *(1) Forfeiture*

The rules of evidence are not self-executing.  We may not reverse a judgment or verdict based on "the erroneous admission of evidence unless:  [¶] (a) There appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated as to make clear the specific ground of the objection or motion." (Evid. Code, § 353, subd. (a).)  This rule exists to give the trial court a concrete legal proposition to pass on, to allow the proponent of the evidence an opportunity to cure the defect, and to prevent abuse.  (*People v. Partida* (2005) 37 Cal.4th 428, 434.)  "What is important is that the objection fairly inform the trial court, as well as the party offering the evidence, of the specific reason or reasons the objecting party believes the evidence should be excluded, so the party offering the evidence can respond appropriately and the court can make a fully informed ruling.  If the court overrules the objection, the objecting party may argue on appeal that the evidence should have been excluded for the reason asserted at trial, but [the party] may not argue on appeal that the court should have excluded the evidence for a reason different from the one stated at trial.  A party cannot argue the court erred in failing to conduct an analysis it was not asked to conduct."  (*Id.* at p. 435.)

Defendant did not object when the prosecutor elicited testimony from Bailey that several rappers had admitted to having worked as pimps, including Eazy-E, Ice Cube and Ice-T, and that he had viewed videos in which they discussed it.  We agree with the People that defendant forfeited any objection to the prosecutor's initial questions to Bailey regarding musicians who rapped about prostitution and had actually been pimps because he failed to object on any ground.

When the prosecutor attempted to play "Blade Hot," a rap video posted on defendant's social media page, defense counsel objected that the video was irrelevant and more prejudicial than probative pursuant to Evidence Code section 352.  We note that

defendant does not challenge the trial court's ruling as to the admissibility of the "Blade Hot" video on these grounds.

When the prosecutor questioned Bailey again as to whether he viewed videos of rappers discussing their involvement in human trafficking, defendant objected for the first time to the evidence as hearsay. Although the question did not ask Bailey to repeat the statements from the video, the trial court overruled the hearsay objection and held that Bailey, as an expert, could testify to hearsay because he was an expert. Defendant's prior objection to the "Blade Hot" video did not preserve relevancy or prejudice objections to these additional questions, which were unrelated to the relevancy or prejudice of the video. Defendant's hearsay objection to the prosecutor's subsequent questions did not preserve other objections, such as relevance, outside the scope of Bailey's expertise, or more prejudicial than probative. Additionally, defendant's hearsay objection was not specific enough to notify the trial court that defendant objected to the questions as calling for information beyond the scope of Bailey's expertise. While defendant correctly notes that expert testimony which does not relate to an issue in the case is not relevant, citing *Daubert v. Merrill Dow Pharmaceuticals, Inc.* (1993) 509 U.S. 579, 591, this case does not address forfeiture or the required specificity of an objection to expert testimony. Therefore, defendant forfeited these objections.

The People argue that, although defense counsel did object to the additional question as to whether Bailey had viewed videos of rappers admitting they had been pimps, the hearsay objection was premature because the prosecutor had not yet asked Bailey to testify to those statements, and defense counsel made no further objection. Nonetheless, the prosecutor defended against the objection with the argument that experts could rely on hearsay, and the trial court overruled the objection and ruled that Bailey, as an expert, could testify to hearsay. While it is true that defense counsel could have objected immediately after each of the prosecutor's questions that followed, such objections would have been futile in light of the trial court's hearsay ruling. Defense

24.

counsel is not required to make a futile objection to preserve an issue for appeal. (*People v. Hill* (1998) 17 Cal.4th 800, 820.) Accordingly, we find that defendant has not forfeited his hearsay objection to the additional questions relating to rappers who were actually pimps.

### *(2) No Miscarriage of Justice*

However, we do not address whether the trial court erred in admitting the evidence over defendant's hearsay objection because the admission of this evidence did not result in a miscarriage of justice. (See Evid. Code, § 353, subd. (b); *People v. Watson* (1956) 46 Cal.2d 818, 836 [defining "miscarriage of justice" as the court's opinion that the defendant would have obtained a more favorable result had the error not been made after examining the "entire cause" and evidence].)

Over defendant's objection, Bailey testified that the rapper Ice-T admitted to being a pimp in an interview, authored a book that included a "pimptionary" of terms used by sex traffickers, and admitted that he idolized another pimp. He also testified that Snoop Dogg admitted that he had been a pimp before becoming a rapper, and 50 Cent admitted he was a pimp and involved in other crimes before obtaining success for his song titled "P.I.M.P." However, Bailey's testimony, to which defendant did not object, described essentially the same content, that is, that Bailey had "seen actual video interviews or written interviews with rappers like Ice Cube and Ice-T, Eazy-E talking about actual[ly] being involved in sexual exploitation prior to them making money from their music."

Because the challenged testimony duplicated other admissible evidence, any alleged evidentiary error in permitting it was harmless under *People v. Watson, supra*, 46 Cal.2d at page 836, and it is not reasonably probable that a result more favorable to defendant would have been reached if the testimony had not been admitted. (See *People v. Bryant, Smith and Wheeler, supra*, 60 Cal.4th at p. 415 [although trial court erred by admitting the hearsay statement, the error was harmless because its content was the same as other properly admitted evidence]; *People v. Flint* (2018) 22 Cal.App.5th 983, 1005.)

### III. *Defendant forfeited claims of prosecutorial misconduct by failing to object and was not prejudiced by any error in any event.*

#### A. Background

During closing argument, defense counsel argued that movies, music, and social media glamorize pimping and even use the term "pimp" to refer to other items in a positive way ("[t]hat movie's so pimp" or "Jordan shoes are pimp"). He argued that defendant was not immune to the glamorization of a pimp as a symbol of wealth and of someone who makes a lot of money, drives fancy cars, wears fancy clothes, and is surrounded by women. Defense counsel further characterized the prosecution's evidence as defendant's exercise of his constitutional right to freely express himself on social media or to hang out on the Blade, and that such circumstances did not prove that he was a pimp.

To emphasize this point, defense counsel played a video interview of Eazy-E, whereby he described some rappers as "studio ganster[s]." Defense counsel explained that Eazy-E was criticizing another rapper, Dr. Dre, because he rapped about a type of life that he did not actually live. Defense counsel likened defendant to someone who portrayed himself as a pimp to suggest he was rich and owned a lot of cars, but the evidence failed to show that defendant ever did anything more than talk about prostitution and failed to demonstrate that he employed sex workers or even had the necessary skills to make money as a sexual exploiter. He also held out Bailey as an example of an individual who listened to rap songs about pimping although he did not work as a pimp.[10]

In rebuttal, the prosecutor characterized defense counsel's "puffery pimp" argument as ineffective in light of Bailey's testimony that numerous rappers had admitted they actually engaged in real pimping. The prosecutor reminded the jury that Bailey

---

[10] The trial court overruled the prosecutor's belated "facts not in evidence" objection to defense's counsel argument by responding, "This is argument."

26.

testified Ice-T wrote a book that included a "pimptionary" of sex work terms and admitted to being a pimp during a magazine interview (a portion of the interview was read to the jury).

The prosecutor then indicated that she intended to play a two-minute video of Snoop Dogg admitting that he was a pimp and that he made a movie about falling in love with one of his sex workers. Defense counsel objected, "We're getting afield." The court allowed the video and stated, "Yeah, but you both—you did it. So I'm going to allow her to do it. After playing the first video, the prosecutor then played snippets of a video of Suga Free, a rapper who admits to pimping, and pointed out terminology previously explained by Bailey.

During a recess after the prosecutor finished playing a second snippet of the video, the court advised the prosecutor, "I think that's it on the CD," and acknowledged that defense counsel had opened the door to the rap world and played a video in closing argument, thereby entitling the prosecutor to rebut it. Defense counsel replied, "She can play that whole thing if she wants. I know that video." The court indicated that enough of the video had been played.

The prosecutor concluded by arguing that no evidence had been presented that defendant was a social media pimp. She pointed to defendant's phone call with Scott, wherein he admitted that he intended to meet Bailey (posing as a 16-year-old sex worker) at the bus station, and other conduct inconsistent with playing a role, such as receiving money from sex workers, private messaging with his sex workers, and posting advertisements on their behalf.

## B. Standard of Review and Applicable Law

Defendant argues that the prosecutor committed misconduct by showing the jury videos of Snoop Dogg and Suga Free in closing argument that had not been admitted into evidence. "It is misconduct for a prosecuting attorney to argue beyond the record by stating facts not in evidence." (*People v. Nadey* (2024) 16 Cal.5th 102, 188 (*Nadey*).)

27.

We review claims of prosecutorial misconduct pursuant to a settled standard. "Under California law, a prosecutor commits reversible misconduct if he or she makes use of 'deceptive or reprehensible methods' when attempting to persuade either the trial court or the jury, and it is reasonably probable that without such misconduct, an outcome more favorable to the defendant would have resulted. [Citation.] Under the federal Constitution, conduct by a prosecutor that does not result in the denial of the defendant's specific constitutional rights—such as a comment upon the defendant's invocation of the right to remain silent—but is otherwise worthy of condemnation, is not a constitutional violation unless the challenged action ' "so infected the trial with unfairness as to make the resulting conviction a denial of due process." ' " (*People v. Riggs* (2008) 44 Cal.4th 248, 298.) However, " ' "a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety." ' " (*People v. Dykes* (2009) 46 Cal.4th 731, 760.)

### C. Analysis

#### (1) Forfeiture

As a preliminary matter, we conclude defendant has forfeited his claim of prosecutorial misconduct. On appeal, defendant argues that the prosecutor committed misconduct by playing video interviews of rappers in closing argument that had not been admitted as evidence. The record reflects, however, that when the prosecutor commenced playing the first video, defense counsel vaguely objected, "We're getting afield," but did not direct the court to the fact that the videos had not been introduced into evidence nor object that the prosecutor had engaged in misconduct by displaying the videos.

An allegation of prosecutorial misconduct must be made in the trial court in order to be preserved for appeal, and an objection on a different ground, such as defendant's "getting afield" objection, is not sufficient to do so. (*People v. Covarrubias* (2016)

28.

1 Cal.5th 838, 893–894 [objection that prosecutor misstated the law in argument does not preserve claim of misconduct]; *People v. Thomas* (2012) 54 Cal.4th 908, 937–938 [objection that argument misstated the record not sufficient to preserve prosecutorial misconduct objection asserted on appeal]; *People v. Fuiava* (2012) 53 Cal.4th 622, 728 [characterizing " 'improper argument' " objection as "nonspecific"]; *People v. Friend* (2009) 47 Cal.4th 1, 29 [an inadequate objection does not preserve a claim of prosecutorial misconduct]; *People v. Dykes, supra*, 46 Cal.4th at p. 766 [claim of misconduct forfeited where only objection was on relevancy grounds]; *People v. Cook* (2006) 39 Cal.4th 566, 607 [objection at trial that a question posed to the witness was argumentative did not preserve an appellate claim that the prosecutor committed misconduct by attempting to shift the burden of proof].)  While the obligation to object is excused "when the 'misconduct [is] pervasive, defense counsel [has] repeatedly but vainly objected to try to curb the misconduct, and the courtroom atmosphere was so poisonous that further objections would have been futile' " (*Friend*, at p. 29), defendant has failed to point to anything in the record to suggest it would have been futile to object to prosecutorial misconduct.

Defendant's objection that the prosecutor was "getting afield" did not preserve a claim of prosecutorial misconduct, and we conclude it has been forfeited.

### (2)     *No miscarriage of justice*

Even if defendant had properly objected and the use of extra-record materials in closing argument to factually augment the record was misconduct (see *People v. Riggs, supra*, 44 Cal.4th at p. 326), we conclude defendant was not prejudiced (see *Nadey, supra,* 16 Cal.5th at p. 189).  In *Nadey*, the prosecutor cross-examined a defense expert concerning Nadey's tattoo to impeach the expert's conclusion that Nadey would be a good prisoner and adjust to prison life, but the expert characterized the tattoo as "a double lightning bolt" rather than "little SS marks" representing the Aryan Brotherhood.  (*Id.* at p. 187.)  In closing argument, the prosecutor read back the cross-examination and

displayed a picture of Nadey's tattoo and photographs from several books about the Gestapo to demonstrate that Nadey's tattoo was a Nazi' symbol and " 'not just something [the prosecutor] made up.' " (*Id.* at p. 188.) Because the books were offered as substantive proof that Nadey's tattoo was, in fact, a part of Nazi symbolism, the prosecutor's use of such books in closing argument was misconduct. (*Id.* at p. 189.)

Nonetheless, our Supreme Court recognized that while the defense expert may have quibbled as to whether Nadey's tattoo was a Nazi symbol, he did concede that members of the Aryan Brotherhood used the Nazi symbol and, therefore, the jury would have been aware of these facts from the trial evidence. (*Nadey, supra*, 16 Cal.5th at p. 189.) Additionally, the jury was instructed that the attorney's arguments were not evidence and its verdict could be based only upon evidence at trial, and the jury was presumed to have followed the court's instructions. (*Ibid.*) In such circumstances, there was no reasonably likelihood that the jury would conclude Nadey was a gang member, and the display of the extra-record materials was relatively brief and did not comprise a pattern of egregious misbehavior rendering the trial fundamentally unfair. (*Id.* at p. 190.) The expert's testimony on cross-examination ultimately conceded that tattoos were a possible signifier of gang membership and, therefore, "[t]he display in closing argument of images depicting the symbol's use in Nazi propaganda, while misconduct, was not so prejudicial that it could have realistically altered the trial' s outcome, in light of all the other evidence." (*Ibid.*)

In this case, the trial court instructed the jury that evidence is only the sworn testimony of witnesses and exhibits admitted into evidence, and nothing the attorneys say, including their opening statements and closing arguments, is evidence. Additionally, evidence was admitted at trial that several well-known rappers had acknowledged having worked as pimps prior to their music careers. Defendant's own closing argument used an interview of a rapper who had actually worked as a pimp to discredit another rapper who did not live that life. We also note that while defendant likened defendant to the

30.

discredited rapper who only pretended to be a pimp, the argument that pimps have been glamorized in music can be used to both argue someone who raps about pimping is a pimp or they are only pretending to be one for music sales.

However, the prosecutor did not argue that defendant was a pimp because he listened to a rap video, and despite both arguments, the jury would have had to view the evidence to determine whether defendant's remarks reflected his actual intent. The question for the jury was whether defendant's posts and communications wherein he discussed being a pimp reflected his intent to induce an individual that he believed to be a minor to engage in a commercial sex act with the additional intent to commit pandering or pimping. The argument that some rappers worked as pimps and other rappers pretended that they were pimps still required the jury to examine the evidence as to what defendant intended when he communicated with Bailey, encouraged him to travel to Bakersfield, and was waiting for a minor commercial sex worker at the bus station.

To make this determination, the jury had before them evidence that defendant privately communicated with a minor commercial sex worker, provided her information as to what he could do for her if she worked for him, encouraged her to commit commercial sex acts to pay his fee, encouraged her to travel to Bakersfield to work with him on the Blade, promised that he would keep her safe while she worked, and promised to provide her a place to live and a car if she earned money for him. Defendant also engaged in private communications with at least three other women whom he either attempted to convince to work for him or who actually sent him money. For example, Cherry communicated to defendant that she "posted" (referring to an Internet advertisement), then sent him money (consistent with a deposit provided for her expenses), which she characterized as having been received from an "out-call" (where Cherry went to the customer to perform the sex act), and then sent a larger amount of money 20 minutes later, consistent with having been paid for engaging in a sex act. Such evidence of defendant's conduct is inconsistent with merely pretending to be a pimp.

31.

Therefore, we conclude that the prosecutor's display of the interviews during closing argument, even if misconduct, "was not so prejudicial that it could have realistically altered the trial's outcome, in light of all the other evidence," and it is not reasonably probable the jury would have rendered a different verdict absent the misconduct.  (*Nadey, supra*, 16 Cal.5th at p. 190.)

## IV.     *The trial court did not abuse its discretion in failing to instruct the jury on evaluating Bailey's testimony as both a percipient and expert witness.*

### A.     Background

Bailey testified as an expert on human trafficking for the prosecution, reviewing and explaining posts to defendant's social media account relating to sexual exploitation, including specialized language.  The following day, he described his communications with defendant while posing as a teenage sex worker and explained evidence from defendant's cell phone relating to commercial sex work.

The trial court advised counsel of the instructions it intended to provide the jury, which included CALCRIM No. 226, "Witnesses," and CALCRIM No. 332, "Expert Witness Testimony."  Defendant did not object or request that either instruction be altered to reflect a witness who provides both percipient and expert testimony.

### B.     Applicable Law and Standard of Review

Defendant contends the trial court erred when it failed to sua sponte instruct the jury regarding Bailey's dual role as a percipient and an expert witness.  Defendant argues the court's failure to separate and clarify Bailey's lay testimony and expert opinion posed a substantial risk the jury accorded his percipient testimony as to undercover communications with defendant unmerited credibility based on his status as an expert and "blunted the jury's evaluation of the evidence that [Bailey] needed no persuasion to work for [defendant]."  We do not find this contention persuasive.

The trial court has a sua sponte duty to instruct "on general principles of law that are commonly or closely and openly connected to the facts before the court and that are

necessary for the jury's understanding of the case." (*People v. Montoya* (1994) 7 Cal.4th 1027, 1047.) The trial court's obligation to provide sua sponte instructions varies from case to case but includes general principles relating to the evaluation of evidence, such as the credibility of witnesses, including experts. (*People v. Daniels* (1991) 52 Cal.3d 815, 885). The sua sponte obligation to instruct the jury on how to evaluate expert witness testimony stems from section 1127b, which provides: "When, in any criminal trial or proceeding, the opinion of any expert witness is received in evidence, the court shall instruct the jury substantially as follows: [¶] Duly qualified experts may give their opinions on questions in controversy at a trial. To assist the jury in deciding such questions, the jury may consider the opinion with the reasons stated therefor, if any, by the expert who gives the opinion. The jury is not bound to accept the opinion of any expert as conclusive, but should give to it the weight to which they shall find it to be entitled. The jury may, however, disregard any such opinion if it shall be found by them to be unreasonable. [¶] No further instruction on the subject of opinion evidence need be given."

However, the trial court's sua sponte obligation does not extend to "specific points developed at the trial." (*People v. Hood* (1969) 1 Cal.3d 444, 449.) As our Supreme Court observed, " 'The trial court cannot reasonably be expected to attempt to revise or improve accepted and correct jury instructions absent some request from counsel.' " (*People v. Kelly* (1992) 1 Cal.4th 495, 535.) Consequently, "[a] defendant who believes that an instruction requires clarification must request it." (*People v. Coddington* (2000) 23 Cal.4th 529, 584, overruled on other grounds in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13.)

### C.      Analysis

Here, the trial court satisfied its sua sponte duty to instruct on expert witness testimony when it gave CALCRIM No. 332, which incorporates the gist of section 1127b. The court instructed the jury:

"Witnesses were allowed to testify as experts and to give opinions. You must consider the opinions, but you are not required to accept them as true or correct. The meaning and importance of any opinion are for you to decide.

"In evaluating the believability of an expert witness, follow the instructions about the believability of witnesses generally. In addition, consider the expert's knowledge, skill, experience, training and education, the reasons the expert gave for any opinion, and the facts or information on which the expert relied in reaching that opinion. You must decide whether information on which the expert relied was true and accurate. You may disregard any opinions you find unbelievable, unreasonable or unsupported by the evidence."

The foregoing instruction correctly stated the applicable legal standard for evaluating expert witness testimony. (See *People v. Felix* (2008) 160 Cal.App.4th 849, 860.) Defense counsel did not request the court to instruct the jury regarding expert testimony, did not object to the court's instruction on expert witness testimony, nor did counsel raise the issue defendant now asserts on appeal. Accordingly, the trial court had no duty to anticipate defendant's appellate argument and modify the standard expert witness instruction. Defendant's failure to request such a clarifying instruction at trial forfeits his claim on appeal. (See *People v. Lang* (1989) 49 Cal.3d 991, 1024 ["A party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language."], disapproved on other grounds in *People v. Diaz* (2015) 60 Cal.4th 1176, 1190; *People v. Andrews* (1989) 49 Cal.3d 200, 218 [same].) Defendant failed to do so, and his argument is forfeited.

Additionally, we are satisfied the court's instructions adequately informed the jury about the difference between expert and lay witness testimony. Adherence to the instructions as a whole would not allow the jurors to believe Bailey's testimony as a percipient witness merely because he testified as an expert. Here, the court instructed the

34.

jury it must base its decision on all the evidence presented at trial (CALCRIM No. 200). Evidence was defined as the sworn testimony of witnesses and any exhibits received into evidence (CALCRIM No. 222). The court informed the jury it alone must judge the credibility or believability of the witnesses, including expert witnesses (CALCRIM Nos. 226, 332). Using CALCRIM No. 226, the court provided several factors to consider in evaluating a witness's credibility, and after evaluating these factors, jurors could decide to believe all or part of any witness's testimony or reject it altogether. The trial court's instruction on how to evaluate an expert's opinion specifically directed the jurors to "follow the instructions about the believability of witnesses generally" (CALCRIM No. 332). We presume the jurors followed these instructions (*People v. Cruz* (2001) 93 Cal.App.4th 69, 73) and therefore reject defendant's assertion the court's instructions posed a substantial risk jurors would not rigorously evaluate Bailey's lay observations merely because he testified as an expert (see *People v. Martin* (1983) 150 Cal.App.3d 148, 158 ["We assume jurors are intelligent persons capable of understanding and correlating jury instructions."]).

Defendant's reliance on *United States v. Freeman* (9th Cir.2007) 498 F.3d 893, 904 (*Freeman*) is unavailing. There, a drug enforcement agent testified as both a lay witness and an expert on the meaning of certain jargon known only to those with specialized knowledge of the drug trade. But the appellate court found the agent erroneously testified as an expert when he interpreted ambiguous statements not involving drug jargon, based only on his general knowledge of the investigation. (*Id.* at p. 902.) The court noted the difficulties that may arise when a witness erroneously testifies to lay observations as an expert: the witness's aura of expertise may move the jury to grant the expert witness unmerited credibility when testifying about factual matters; and the risk of juror confusion in discerning whether the expert is basing an opinion on reliable methodology or on personal knowledge of the case. (*Id.* at p. 903.)

The *Freeman* court found, "[T]he line between [the witness]'s lay and expert testimony was never articulated for the jury. This lack of clarity regarding [the witness]'s dual roles created a risk that there was an imprimatur of scientific or technical validity to the entirety of his testimony." (*Freeman, supra*, 498 F.3d at p. 903.) Yet the *Freeman* court did not prohibit a witness from testifying in both capacities and found a reduced risk of error if the jurors are aware of the witness's dual roles. (*Id.* at p. 904.)

Here, we are satisfied the trial court's instructions made it clear how to evaluate and distinguish Bailey's testimony as a percipient witness and as an expert. As discussed above, the court's instructions guided the jury in evaluating the testimony of lay and expert witnesses. Defendant fails to demonstrate how the court's instructions were inadequate, nor does he propose language the court should have included in a limiting instruction. For one thing, it was not likely the expert designation would cause the jury to unduly credit Bailey about factual matters. Bailey's percipient testimony included his seizure and review of the contents of defendant's cell phone and the fact of his communications with defendant, issues that were essentially uncontested. As to the language of defendant's communications with Bailey, the words exchanged were memorialized on defendant's social media account and similarly were not themselves contested. Bailey's expert testimony as to the human trafficking jargon used in the communications was also not contested, as defendant admitted that he used pimp jargon and portrayed himself in that light, but argued he was only pretending to increase his own stature. There is no likelihood the jury would have been confused by any interplay or overlap between the two aspects of Bailey's testimony, nor that defendant was prejudiced by the lack of instruction as to dual roles as an expert and a percipient witness.

Finally, unlike *Freeman*, this case does not involve the erroneous admission of evidence. Defendant did not object in the trial court, and does not argue here, that Bailey was unqualified to offer his opinions or testimony on human trafficking in general or that Bailey's communications with defendant in particular were objectionable. Nor does

defendant assert Bailey provided inadmissible lay or factual testimony over a valid objection. Defendant does not suggest it was inappropriate for Bailey to rely on information gleaned from his observations and review of defendant's social media posts and other communications in forming his opinions that defendant was recruiting his undercover persona for human trafficking.

Defendant argues that he was prejudiced because the failure to provide additional instruction "blunted the jury's evaluation of the evidence that [Bailey] needed no persuasion to work for [defendant]." The argument rests upon the invalid assumption, previously addressed in part I.B., that the prosecution was required to show that Bailey was actually persuaded to work for defendant. However, defendant was guilty of the offense if he only intended to cause Bailey to commit a commercial sex act with either the intent to derive support or maintenance from his earnings (pimping) or the intent to persuade him to prostitute himself for defendant (pandering). The " 'commission of an attempt does not require proof of any particular element of the completed crime' " other than intent. (*Moses, supra*, 10 Cal.5th at p. 909.)

We conclude that the trial court did not err in failing to provide the jury additional instruction regarding Bailey's expert testimony.

## V.    *The trial court did not err in failing to instruct the jury as to lesser included offenses of attempted contributing to the delinquency of a minor and attempted inveiglement of a minor.*

Defendant contends that the trial court erred by failing to instruct the jury that attempted contributing to the delinquency of a minor (§ 272) and attempted inveiglement of a minor (§ 266) are lesser included offenses of human trafficking. We disagree.

### A.    Standard of Review and Applicable Law

"A trial court has a sua sponte duty to 'instruct on a lesser offense necessarily included in the charged offense if there is substantial evidence the defendant is guilty only of the lesser.' [Citation.] Substantial evidence in this context is evidence from

37.

which a reasonable jury could conclude that the defendant committed the lesser, but not the greater, offense. [Citation.] 'The rule's purpose is . . . to assure, in the interest of justice, the most accurate possible verdict encompassed by the charge and supported by the evidence.' [Citation.] In light of this purpose, the court need instruct the jury on a lesser included offense only '[w]hen there is substantial evidence that an element of the charged offense is missing, but that the accused is guilty of' the lesser offense." (*People v. Shockley* (2013) 58 Cal.4th 400, 403–404, fourth bracketed insertion in original.)

Our Supreme Court has articulated two tests to determine whether an uncharged offense is necessarily included within a charged offense: the "elements" test and the "accusatory pleading" test. "Under the elements test, if the statutory elements of the greater offense include all of the statutory elements of the lesser offense, the latter is necessarily included in the former. Under the accusatory pleading test, if the facts actually alleged in the accusatory pleading include all of the elements of the lesser offense, the latter is necessarily included in the former." (*People v. Reed* (2006) 38 Cal.4th 1224, 1227–1228.)

We review de novo whether the trial court committed legal error by failing to instruct on an assertedly lesser included offense. (*People v. Cole* (2004) 33 Cal.4th 1158, 1218.)

### B. Analysis

Defendant also contends that contributing to the delinquency of a minor (§ 272) is a lesser included offense of human trafficking under the accusatory pleading test. This contention also fails.

Section 266, pandering, provides punishment for a person who "inveigles or entices" a minor into a house of ill fame, or of assignation, or elsewhere, for the purpose of prostitution. A defendant contributes to the delinquency of a minor if he or she commits an act or omission which "causes or tends to cause or encourage any person under the age of 18 years to come within the provisions of Section 300, 601, or 602 of the

Welfare and Institutions Code." (§ 272, subd. (a)(1); see *People v. Vincze* (1992) 8 Cal.App.4th 1159, 1162–1163.) Section 601 of the Welfare and Institutions Code pertains to minors who are truant or habitually disobey their parents and is not relevant here. (See Welf. & Inst. Code, § 601.) Section 602 of the Welfare and Institutions Code confers juvenile court jurisdiction over minors who commit crimes, but prostitution is not a crime for a minor (§ 647, subd. (b)(5)). However, section 300, subdivision (b)(4) of the Welfare and Institutions Code describes "a child who is sexually trafficked, as described in Section 236.1," and "whose parent or guardian failed to, or was unable to, protect the child."

The People argue that section 272 is not a lesser included offense in the case of a fictitious minor because such a minor cannot have a parent or guardian that failed to adequately supervise or protect the child. Similarly, the People argue that section 266 requires proof that the minor is a person under 18 years of age, which does not apply where the minor is actually an undercover detective. Defendant responds that the People fail to address that attempts to commit the lesser included offenses would not require a completed crime and factual impossibility is not a defense to an attempt. Our Supreme Court's decision in *Moses* supports defendant's argument that attempts to commit crimes involving minors do not require proof that defendant targeted an actual minor. (*Moses, supra*, 10 Cal.5th at pp. 912–913 [attempt to violate section 236.1 does not require proof that the defendant targeted an actual minor but, where no actual minor involved, does require additional intent to target a minor].)

However, we do not decide whether attempts to violate sections 266 and 272 are lesser included offenses of section 236.1 because a trial court is only obliged to instruct on a lesser included offense where there is substantial evidence from which a rational jury could conclude that the defendant committed only the lesser offense. (*People v. Shockley, supra*, 58 Cal.4th at pp. 403–404.) Defendant has failed to articulate a view of

the evidence in which he could be convicted of an attempt to commit a lesser included offense but not also of attempted human trafficking.

Defendant argues that while he discussed the possibility of Bailey working as a prostitute for him, the jury could have concluded that the nature of their relationship was not yet solidified, and defendant wished only to discuss the possibility with him. However, defendant does not posit a set of facts in which he could have the specific intent to inveigle or entice a minor into an assignation for the purpose of prostitution (§ 266), as required for an attempt (see *Moses, supra*, 10 Cal.5th at pp. 912–913), but not the specific intent to induce a minor to engage in a commercial sex act with the intent to receive pay for doing so (§ 266h), or intent to persuade him to work as a prostitute (§ 266i). Similarly, defendant does not present a scenario in which he could have the specific intent to encourage a minor to come within the provisions of section 300 of the Welfare and Institutions Code by becoming a victim of commercial sex trafficking without also intending to persuade a minor to engage in a commercial sex act and work as a prostitute (§ 266i). (See *Moses*, at pp. 912–913 [attempt requires the " ' "specific intent to commit the [completed] crime" ' "].)

Furthermore, even had the trial court been required to instruct the jury regarding lesser included offenses, we would discern no prejudice from that error. In this context, review for prejudice " 'focuses not on what a reasonable jury could do, but what such a jury is *likely* to have done in the absence of the error under consideration.' " (*People v. Beltran* (2013) 56 Cal.4th 935, 955.) In making that evaluation, "an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so relatively strong, and the evidence supporting a different outcome is so comparatively weak, that there is no reasonable probability the error of which the defendant complains affected the result." (*People v. Breverman* (1998) 19 Cal.4th 142, 177, overruled on another ground in *People v. Schuller* (2023) 15 Cal.5th 237, 260.)

Under that standard, any failure to instruct regarding lesser included offenses was harmless, as the evidence establishing defendant's guilt was compelling. Defendant's only argument was that he did not mean the words he said to Bailey, Cherry, and T.J. or posted on his social media account. However, defendant posted commercial sex work advertisements for women on the Internet and received thousands of dollars from sex workers. No reasonable jury would conclude, as defendant argues, that he "was fairly non-committal" and "said they could talk once [Bailey] had the fee and at one point attempted to back away from dealing with [Bailey] because [he] had 'come out of the blue.' " Even if some of defendant's earlier comments could have been construed as noncommittal as to working with Bailey, defendant's communications with Bailey the day before his arrest clearly demonstrate his intention to recruit Bailey. On December 8, 2022, defendant initiated communication with Bailey and promised, "If you trap right, I'll get you a spot and a whip, ma," meaning that if Bailey performed well as a commercial sex worker, defendant would provide Bailey with a residence and a vehicle. When Bailey asked what bus he should take, defendant replied, "As long as you get here, ma." When Bailey stated that he was nervous, defendant told him to "bring that ass" and get on the bus. Thereafter, defendant told Scott that he was expecting Bailey to arrive by bus, and defendant showed up at the bus station to meet Bailey.

On this record, the failure to instruct the jury regarding contributing to the delinquency of a minor or pandering was harmless, as there is no reasonable likelihood that those instructions would have resulted in an outcome more favorable to defendant. In sum, defendant has not shown that the trial court erred in failing to instruct the jury as to any lesser included offenses.

## VI. The trial court did not abuse its discretion in admitting evidence of defendant's communications with other sex workers.

### A. Background

The prosecutor filed a motion to admit evidence of defendant's communications with other sex workers as other acts evidence pursuant to Evidence Code section 1101. The prosecutor sought to admit communications from defendant's Instagram account with an account named "imadehim_cum" on December 6, 2022, in which defendant attempted to recruit the sex worker to work for him. The prosecutor also sought to admit communications found on defendant's phone to "Cherry" that included commercial sex work discussions. Additionally, a sex worker named T.J. provided Bailey a screenshot of text messages she received from defendant in which defendant attempted to recruit her to work for him. The prosecutor offered these communications as evidence of defendant's intent and meaning to recruit Bailey as a commercial sex worker because he had similarly recruited other sex workers.

The trial court granted the motion over defendant's objection and concluded that the statements were relevant even without evidence as to the identity of the sex workers because they showed defendant's intent. The court explained, "I know that the defense is going to be he wasn't intending to procure a prostitute. So it shows intent, planned and schemed as to how he would go about doing this, and knowledge. Even if that individual never indicated they were under the age of 18. It's—I think it's relevant." The trial court further concluded that presentation of the evidence would not be unduly time consuming, and its probative value clearly outweighed any prejudicial effect.

### B. Standard of Review and Applicable Law

Evidence Code section 1101, subdivision (b) makes admissible "evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, . . .) other than his or her disposition to commit such an act."

"Evidence of uncharged crimes is admissible to prove identity, common design or plan, or intent only if the charged and uncharged crimes are sufficiently similar to support a rational inference of identity, common design or plan, or intent." (*People v. Carter* (2005) 36 Cal.4th 1114, 1147.) When introduced to show similar intent, the uncharged crimes need only be sufficiently similar to the charged offenses to support the inference that the defendant " ' " 'probably harbor[ed] the same intent in each instance.' " ' " (*People v. Kipp* (1998) 18 Cal.4th 349, 371.)

We review the admission of evidence under Evidence Code section 1101, subdivision (b) for abuse of discretion. (*People v. Carter, supra*, 36 Cal.4th at p. 1149.) As such, "we will not disturb the trial court's ruling 'except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' " (*People v. Goldsmith* (2014) 59 Cal.4th 258, 266.)

### C.     Analysis

To commit the crime of human trafficking, the defendant must act with the intent to cause, induce, or persuade a minor to engage in a commercial sex act and with the additional intent to effect or maintain a violation of one of the offenses enumerated in the statute. (*Moses, supra*, 10 Cal.5th at pp. 912–913.) Here, the disputed evidence was relevant to the issue of defendant's intent. At trial, defendant's counsel argued defendant had no intention of pimping or pandering a minor, nor encouraging a minor to commit a commercial sex act. Instead, counsel argued defendant was merely pretending to be a pimp to glamorize himself. Evidence of defendant's other communications regarding pimping activity was admissible to rebut these claims. As the court noted, a key issue was whether defendant actually intended to recruit a 16-year-old to engage in commercial sex acts or whether he was just acting a part. Other conversations were relevant to understanding defendant's communications with Bailey.

We find persuasive the analysis of a similar situation in *People v. Clark* (2019) 43 Cal.App.5th 270 (*Clark*). In that case, Clark was convicted of trafficking a minor,

attempted pimping of a minor, and pandering. (*Id.* at p. 273.) The prosecution introduced several text messages with third parties, including messages in which Clark referred to himself as " 'P,' " and messages with women encouraging them to do sex work for him. (*Id.* at pp. 276–277.) On appeal, Clark asserted the evidence was improper character evidence under Evidence Code section 1101 and should have been excluded. (*Clark*, at p. 289.) The court disagreed, saying the evidence was relevant to the issue of Clark's intent because it "gave 'meaning to the conversations that [Clark had] with [the victim].' " (*Id.* at p. 290.) Similarly, the evidence was highly probative under Evidence Code section 352 because Clark " used language that is unique to the pimping subculture, [and] the evidence provided the jury with context necessary to understand [Clark]'s communications." (*Clark*, at p. 291.) Although there was a risk of undue prejudice because of the emotional bias it might induce, the evidence was within the trial court's discretion to admit. (*Id.* at pp. 291–292.)

Here, as in *Clark*, defendant referred to himself as a pimp in many of his messages and, according to Bailey's testimony, attempted to induce women to become prostitutes. The messages demonstrate defendant's knowledge and use of jargon common in the prostitution subculture, as well as common practices for prostitutes, tending to prove he would have believed that he was communicating with a prostitute in conversations with Bailey. As such, the court did not abuse its discretion in finding the messages were admissible under Evidence Code section 1101, subdivision (b).

We reject defendant's argument that the evidence had little probative value given that the prosecution failed to prove that the individuals involved in the other communications were minors. Defendant has offered no reason to believe that the intent to pimp or pander or persuade minor to engage in commercial sex acts is so dissimilar as the intent to pimp in general. Defendant has provided no evidence that pimps who prostitute adults do not also prostitute minors, or that the terminology used by individuals in the prostitution subculture differs depending upon the age of the prostitute.

44.

For similar reasons, the evidence had great probative value under Evidence Code section 352. And, as in *Clark*, although the messages were prejudicial, adult prostitution is not as prejudicial as the charged offense involving a minor, and we cannot say the prejudicial effect clearly outweighed the probative value of providing context for defendant's messages to Bailey. In any case, the trial court's legal analysis shows it did not make its evidentiary ruling in an arbitrary, capricious, or patently absurd manner. Thus, defendant has shown no abuse of discretion.

## DISPOSITION

The judgment is affirmed.

HILL, P. J.

WE CONCUR:

MEEHAN, J.

FAIN, J.†

---

† Judge of the Fresno Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.